IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

INSYTE MEDICAL             :      CIVIL ACTION
TECHNOLOGIES, INC.         :
                           :
          v.               :
                           :
LIGHTHOUSE IMAGING, LLC    :      NO. 13-1375

MEMORANDUM

McLaughlin, J.                          March 11, 2014

This action arises from the plaintiff, InSyte Medical Technologies, Inc., doing business as Trice Orthopedics, Inc. ("Trice"), entering into a relationship with the defendant, Lighthouse Imaging, LLC ("Lighthouse"), for the development of an "office arthroscope." This device was for use by orthopedic surgeons to examine inside a patient's joints less invasively. Trice sued Lighthouse for breach of contract, negligence, negligent misrepresentation, fraud, and breach of fiduciary duty. The Court considers here a motion to dismiss by Lighthouse pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court will grant Lighthouse's motion and dismiss the negligence, negligent misrepresentation, fraud, and breach of fiduciary duty claims. Because Lighthouse has not moved to dismiss Count III of the complaint, Trice's breach of contract claim will proceed.

I.   <u>Background</u>[1]

Trice is a medical device company that owns technology that can provide real-time visualization in sports medicine, spine, and other orthopedic applications.  Trice has proprietary rights to a disposable office arthroscopic system.  Compl. ¶ 5.

Lighthouse is a well-known design and engineering firm specializing in miniature optical devices.  Since 1984, Lighthouse has been a leading provider of optical engineering and design services as an FDA-registered medical device manufacturer.  Lighthouse claimed to have the capability to design, engineer, and manufacture prototypes and products related to Trice's technology.  Specifically, Lighthouse claimed to have expertise in optical testing and evaluation, optical test and measurement systems, medical illumination, fiber-optic imaging systems technology, feasibility studies, and product definition.  <u>Id.</u> ¶ 6.

Trice approached Lighthouse in early 2012 to design and develop a prototype of a probe device that would enable orthopedic surgeons to examine inside a patient's joints less invasively than conventional hospital- or surgical-based

---

[1] The Court accepts all well-pleaded facts in the complaint as true and draws all reasonable inferences in favor of the non-moving party, while disregarding any legal conclusions.  <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).

arthroscopic surgery.   Trice's device is intended to be used in a surgeon's office so the surgeon could inspect the inside of a joint by inserting a miniature lens into the joint and wiring a computer tablet to the lens.   Originally, the Trice device was conceived to have a spherical handle that resembled a cue ball. Id. ¶ 7.

In March 2012, Trice hired Lighthouse to prepare a "design input document" for $15,000.   Id. ¶ 8.   A month later, Trice began to negotiate with Lighthouse regarding the development of a commercially feasible "office arthroscope." Id. ¶ 9.   On June 12, 2012, the parties entered into a "Development Contract."   Id. ¶ 10.[2]

In the Development Contract, Lighthouse represented that it "possesses unique capability in the design and manufacture of miniature medical optics devices," having "firsthand experience in the assembly of precision lenses suitable for endoscopy as well as in the packaging and sealing for sterilization of medical sensor/lens assemblies."   Id. ¶ 11 (quoting Development Contract at 4).   Lighthouse agreed to

---

[2] A copy of the Development Contract is attached to the complaint as Exhibit A.   Trice alleges that in December 2012, it proposed a revised version of the Development Contract, a co-development and manufacturing agreement, to clarify the parties' rights and obligations.   Compl. ¶ 20.   There are no allegations that this second agreement was executed.

develop a prototype disposable arthroscopic system based on Trice's design input, procure "all components necessary to manufacture 30 complete fiberoptic endoscope needle probe assemblies," and manufacture the prototypes.  Id.; see also Development Contract at 1.

The Development Agreement states that "the intellectual property used in the opto-mechanical subassembly for the lens assembly already exists at Lighthouse," and that "Lighthouse grants Trice an irrevocable non-exclusive worldwide license to sell any designs used in the deliverables described in this proposal."  Compl. ¶¶ 12, 13 (quoting Development Contract at 4).  Finally, Lighthouse agreed that if it "decides to discontinue its business of making miniature lens assemblies, upon Trice's request, [it] will deliver to Trice its drawings and procedures used in the design."  Id. ¶ 14 (quoting Development Contract at 4).

Trice agreed to pay Lighthouse more than $455,000 based on design, engineering, prototyping, and manufacturing milestones in the project.  Trice made an initial payment of $70,000 for Lighthouse to commence its work and paid monthly invoices thereafter.  Trice has paid Lighthouse $491,562 to date for its services.  Id. ¶ 15.

4

The parties communicated every Monday and Thursday through product development calls to discuss the status of Lighthouse's work.  Trice states that Lighthouse was represented during these calls by engineers, while Trice was represented primarily by one of its officers who did not have an engineering or technical background.  Id. ¶ 16.

As the project evolved, Lighthouse's engineers allegedly recommended changes to Trice's device that caused Trice to incur unanticipated costs, jeopardized the project schedule, and compromised the marketability of the product. Trice approved these changes in reliance on Lighthouse's expertise in optical engineering.  Id. ¶ 17.

The complaint alleges, for example, that Lighthouse advised Trice in the summer of 2012 to abandon its proposed design for the spherical handle.  Instead, Lighthouse recommended that Trice use a longer handle because the internal lens assembly required more space.  Trice alleges that, in reliance upon Lighthouse's engineers' recommendations, it approved a new handle and lens design proposed by Lighthouse. Trice asserts that it later learned that Lighthouse's recommendation was a pretext intended to solidify Lighthouse's position as the manufacturer of the device.  Id. ¶ 18.

During the fall of 2012, Lighthouse's electrical engineers allegedly convinced Trice to permit Lighthouse to add internal electrical software and hardware components, centered on an "evaluation board," to enhance the device's ability to capture, relay, and display images seen through the lens. Lighthouse emphasized that it had experience using this equipment, and so Trice authorized Lighthouse to proceed with its proposal.  Id. ¶ 19.

Trice asserts that Lighthouse, in fact, had no experience with the equipment and could not get either the evaluation board or other recommended software to work in a timely manner.  Because Lighthouse lacked the ability to use the equipment it recommended, Lighthouse had to call in outside consultants, such as the evaluation board manufacturer and another vendor to assist with the software.  Trice alleges that Lighthouse hid these problems for weeks and disclosed them only after Trice expressed concern over delay in the project schedule and increasing costs.  Id.

In January 2013, Trice learned through its own review of engineering drawings that Lighthouse did not own the intellectual property rights to all of the components of the device.  Trice discovered this fact when one of Trice's hired engineers found a part number in an engineering drawing supplied

6

by Lighthouse that contained the name "Clarus."   Lighthouse had
embedded, without Trice's knowledge, components made by a third
party, Clarus Medical.   Clarus Medical not only owned the
technology but, according to Lighthouse's Chief Technology
Officer, refused to release its proprietary design to a third
party.   Id. ¶ 21.

Trice asked Lighthouse to confirm that it had the
right to grant the worldwide license to the entire product it
was developing.   Lighthouse acknowledged that Clarus had refused
to release the design of its subassembly in the device, thereby
prohibiting Trice from commercializing the product it had hired
Lighthouse to develop for commercial use.   Id.


II.  Legal Standard

A motion to dismiss filed pursuant to Rule 12(b)(6)
tests the sufficiency of the complaint.   Conley v. Gibson, 355
U.S. 41, 45 (1957), abrogated in other respects by Bell Atl.
Corp. v. Twombly, 550 U.S. 544 (2007).   A claim may be dismissed
under Rule 12(b)(6) for "failure to state a claim upon which
relief can be granted."

Although Rule 8 requires only that the complaint
contain "a short and plain statement of the claim showing that
the pleader is entitled to relief" to "give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests," the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2) and Conley, 355 U.S. at 47).  Similarly, naked assertions devoid of further factual enhancement will not suffice.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 557).

Although "conclusory" or "bare-bones" allegations will not survive a motion to dismiss, Fowler, 578 F.3d at 210, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

The Court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion.  First, the factual matters averred in the complaint, and any attached exhibits, should be separated from legal conclusions asserted.  Fowler, 578 F.3d at 210.  Any facts pleaded must be taken as true, and any legal conclusions asserted may be disregarded.  Id. at 210-11.  Second, the Court must determine whether those factual matters averred are sufficient to show that the plaintiff has a

"plausible claim for relief."  Id. at 211 (quoting Iqbal, 556 U.S. at 679).

This two-part analysis is "context-specific" and requires the Court to draw on "its judicial experience and common sense" to determine if the facts pleaded in the complaint have "nudged [the plaintiff's] claims" from "conceivable to plausible."  Iqbal, 556 U.S. at 679-80.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678.

The Third Circuit has summarized the post-Twombly standard as follows:  "'[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  Phillips, 515 F.3d at 234 (citations omitted) (quoting Twombly, 550 U.S. at 556).

III.  Discussion

    A.  Choice of Law

        1.  Pennsylvania's Choice-of-Law Rules

The parties raise the issue of whether Maine or Pennsylvania law applies with regard to the "gist of the action" doctrine.  The Court concludes that this is a false conflict and Pennsylvania law will apply on this issue.[3]

---

[3] The Development Contract, attached to the complaint as Exhibit A, contains the following choice-of-law clause:

> No amendment or modification hereof shall be valid or binding upon the parties unless made in writing and signed by both parties.  This agreement shall be governed in all respects by the substantive laws of the State of Maine (excluding conflict of laws rules).  This agreement constitutes the complete and exclusive understanding and agreement of the parties relating to the subject matter hereof and supersedes all prior understandings, proposals, agreements, negotiations, and discussions between the parties, whether written or oral.

Development Contract at 3 (emphasis added).

    The Court interprets this language to mean that only claims relating to the construction and interpretation of the Development Contract will be judged according to Maine law.  The parties did not provide more broadly that Maine law would apply to tortious conduct that led up to the execution of the contract or to other actions arising out of their relationship.  The parties also did not refer to the matter of contract validity.  Thus, the counts of the complaint at issue in this motion to dismiss are not subject to the parties' contractual choice of law and the Court must employ Pennsylvania's general choice-of-law rules in deciding which substantive law governs these

Federal courts exercising diversity jurisdiction must apply the choice-of-law rules of the forum state.  On Air Entm't Corp. v. Nat'l Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941)).  Therefore, Pennsylvania choice-of-law rules apply to this case.

Pennsylvania applies an "interest/contacts" methodology to choice-of-law questions.  See Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226-27 (3d Cir. 2007).  This is a "flexible choice of law rule which weighs the interests [its] sister-states may have in the transaction."  Powers v. Lycoming Engines, 328 F. App'x 121, 124 (3d Cir. 2009) (quoting Commonwealth v. Eichinger, 915 A.2d 1122, 1133 (Pa. 2007)).

---

claims.  See U.S. Claims, Inc. v. Saffen & Weinberg, LLP, No. 07-0543, 2007 WL 4225536, at *8 n.8 (E.D. Pa. Nov. 29, 2007); Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F. Supp. 2d 589, 593-94 (E.D. Pa. 1999).

The parties have also discussed whether the economic loss doctrine or the gist of the action doctrine applies here. Although the Third Circuit has recognized Pennsylvania's economic loss doctrine, which similarly seeks to separate true tort and contract actions, the Third Circuit has clarified that the doctrine applies primarily in products liability cases, while the gist of the action doctrine is a "better fit" for non-products liability claims.  See Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 104 n.11 (3d Cir. 2001). Accordingly, this Court will examine choice of law in the context of the gist of the action doctrine.

Pennsylvania's choice-of-law analysis requires the Court to conduct a two-part inquiry:  The first level of scrutiny considers whether there is "an actual or real conflict between the potentially applicable laws." Hammersmith, 480 F.3d at 230.  If there are relevant differences between the laws, then the court should examine the governmental policies underlying each law, and classify the conflict as a "true," "false," or an "unprovided-for" situation.  Id.

Whether a conflict is true or false depends on each jurisdiction's interest in having its law applied.  If "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law," then the conflict is a false one and "the court must apply the law of the state whose interests would be harmed if its law were not applied." Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991).

If both jurisdictions' governmental interests would be impaired by the application of the other jurisdiction's law, then a "true" conflict exists.  Hammersmith, 480 F.3d at 230. In this situation, a deeper level of analysis is necessary.  The Court must determine which state has the "greater interest in the application of its law." Id. at 231 (quoting Cipolla v. Shaposka, 267 A.2d 854, 856 (Pa. 1970)).  To determine the significance of a state's interests, the Court assesses the

12

"contacts each state has with the [events giving rise to the claim], the contacts being relevant only if they relate to the 'policies and interests underlying the particular issue before the court.'"  Id. (quoting Griffith v. United Air Lines, Inc., 203 A.2d 796, 805 (Pa. 1964)).

Because choice-of-law analysis is issue specific, different states' laws may apply to different issues in a single case, a principle known as "depecage." Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).  Although no Pennsylvania court has explicitly addressed it, the Third Circuit has predicted that Pennsylvania courts would apply depecage in appropriate cases.  See Wolfe v. McNeil-PPC, Inc., 703 F. Supp. 2d 487, 492 (E.D. Pa. 2010) (citing Taylor v. Mooney Aircraft Corp., 265 F. App'x 87, 91 (3d Cir. 2008)).

### 2.   Pennsylvania Law

In Pennsylvania, the gist of the action doctrine is a theory under common law "designed to maintain the conceptual distinction between breach of contract claims and tort claims." Addie v. Kjaer, 737 F.3d 854, 865-66 (3d Cir. 2013) (quoting eToll, Inc. v. Elias/Savion Adver., Inc., 811 A.2d 10, 14 (Pa. Super. Ct. 2002)).

13

This doctrine is policy-based, arising out of the concern that tort recovery should not be permitted for contractual breaches.  Id. at 865 (citing Glazer v. Chandler, 200 A.2d 416, 418 (Pa. 1964)).  Thus, while the existence of a contractual relationship between two parties does not prevent one party from bringing a tort claim against another, the gist of the action doctrine precludes tort suits for the mere breach of contractual duties unless the plaintiff can point to separate or independent events giving rise to the tort.  See id. at 866 (citing Air Prods. & Chem., Inc. v. Eaton Metal Prods. Co., 256 F. Supp. 2d 329, 340 (E.D. Pa. 2003)).

Generally, courts apply the gist of the action doctrine when the claims are:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contact claim or the success of which is wholly dependent on the terms of a contract.

eToll, 811 A.2d at 19 (citations omitted).


3.  Maine Law

The gist of the action doctrine has seldom been mentioned, either by name or in principle, in Maine.  Both parties point to Sprague Energy Corp. v. Massey Coal Sales Co.,

14

No. 05-222, 2006 WL 696197 (D. Me. Mar. 15, 2006), <u>report and recommendation adopted</u>, 2006 WL 1071891 (D. Me. Apr. 21, 2006), as encapsulating Maine's approach to this doctrine.  There, the defendant sought dismissal of several tort claims on the basis that they were "merely disguised iterations" of the plaintiff's contract claims.  <u>Id.</u> at *3.  The magistrate judge stated, "Maine (unlike, for example, Pennsylvania) has no general prohibition against classifying asserted wrongful conduct in both tort and contract terms."  <u>Id.</u>  The magistrate judge recommended denying the motion to dismiss because the plaintiff "[did] not allege that [the defendant] was negligent in that it failed to honor the terms of an agreement. . . . Rather, . . . [the plaintiff] alleges conversion, fraud, and interference with contract."  <u>Id.</u> at *4.

The court in <u>Sprague</u> cited <u>S.D. Warren Co. v. Eastern Electrical Corp.</u>, 183 F. Supp. 2d 113 (D. Me. 2002) as "noting differences between Maine law and Pennsylvania's 'gist of the action' doctrine."  <u>Sprague</u>, 2006 WL 696197, at *3.  The court in <u>S.D. Warren</u> questioned, with regard to a negligence cause of action, whether it

> should look to Maine's choice of law rules as they
> relate to contract actions or its choice of law rules
> relating to tort actions.  If I choose the former, I
> must then confront the question of whether
> Pennsylvania's "gist of the action" rule bars this

> count; if I choose the latter then under Maine's
> choice of law rules it appears that the action would
> be governed by Maine negligence law. . . . While the
> negligence count is framed as a separate count, I
> think it is a close question whether [the plaintiff]
> has alleged anything other than a negligent failure to
> perform under the contract.

183 F. Supp. 2d at 123-24.  Both sides agreed, however, that

Maine tort law should govern this count, so the court did not

define Maine's policy as to the gist of the action doctrine.  It

is questionable, however, whether the S.D. Warren court stated

that Maine rejected the gist of the action doctrine.

In Neurology Associates of Eastern Maine, P.A. v.

Anthem Health Plans of Maine, Inc., No. 02-184, 2004 WL 3196899

(Me. Super. Ct. Oct. 14, 2004), also cited by Sprague, the court

held that the negligence claim was indistinguishable from the

breach of contract claim in the complaint because the negligence

claim "fail[ed] to state any facts establishing anything beyond

the simple breach of the agreement between the parties. . . .

[T]here is no allegation of [tortious] conduct independent of

the contractual obligation to perform."  Id. at *1.  To this

Court, Neurology Associates appears to apply principles similar

to Pennsylvania's gist of the action doctrine and does not

support the conclusion that Maine has considered and rejected

that doctrine.

Lastly, there are two cases in the District of Maine that cite Jones v. Route 4 Truck & Auto Repair, 634 A.2d 1306 (Me. 1993), as concluding that Maine does not generally prohibit the pleading of breach of contract and tort theories arising from the same conduct.  See Net 2 Press, Inc. v. 58 Dix Ave. Corp., 266 F. Supp. 2d 146, 168 (D. Me. 2003); Maine Oxy-Acetylene Supply Co. v. Prophet 21, Inc., No. 01-91, 2002 WL 126625, at *8 n.7 (D. Me. Jan. 31, 2002).  In fact, the Jones court found that a directed verdict for the defendant on negligence was improper in a case involving both breach of contract and negligence claims, because "evidence reasonably could support a finding of causation between defendant's inaction and plaintiff's damages."  634 A.2d at 1309.  The Jones court did not explicitly reject the gist of the action doctrine.

4.   Choice-of-Law Analysis

There is no dispute that there are actual differences between Maine and Pennsylvania law as to the gist of the action doctrine.  The parties disagree, however, on whether there is a true conflict presented here.  The plaintiff argues that this case presents a true conflict because Maine has no rule against classifying wrongful conduct in both tort and contract terms.  Pl.'s Opp'n at 12.  The defendant argues that the conflict is

17

false because, while Pennsylvania has adopted a policy
prohibiting contract claims from being recast as tort claims,
Maine has not fully addressed this issue and had neither adopted
nor specifically rejected the gist of the action doctrine.
Def.'s Reply Br. at 3-4.  The Court agrees with the defendant
that a false conflict is present here.

Pennsylvania has continually applied the gist of the
action doctrine in recognition of the policy that courts have
been cautious about permitting tort recovery for contractual
breaches.  The rationale behind the gist of the action doctrine
is that recovery in tort for breaches of duties imposed by
mutual consent, rather than "as a matter of social policy,"
would "erode the usual rules of contractual recovery."  eToll,
811 A.2d at 14.  Thus, one party to a contract may not sue the
other in tort if the duties underpinning the tort claim arose
merely because the parties agreed to them.  Nova Design Techs.,
Ltd. v. Walters, 875 F. Supp. 2d 458, 466 (E.D. Pa. 2012), as
amended, No. 10-7618, 2012 WL 2500591 (E.D. Pa. June 29, 2012).

Maine, however, has not adopted or rejected the gist
of the action doctrine.  In some cases, Maine has applied
principles similar to the gist of the action doctrine.  If this
Court declined to apply the gist of the action doctrine and
allowed the plaintiff to pursue both breach of contract and tort

18

theories arising from the same conduct, Pennsylvania's policy against such duplicative recovery would be harmed.  Maine has no policy against limiting a plaintiff to recovery in contract for contractual breaches, and so Maine would not be harmed by this Court's application of the gist of the action doctrine. Therefore, because only Pennsylvania's governmental interests would be impaired by the application of Maine law, the Court must apply Pennsylvania's gist of the action doctrine here.

> B.   Application of Pennsylvania's Gist of the Action Doctrine

Pennsylvania courts apply the gist of the action doctrine "to determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract." Bohler-Uddeholm, 247 F.3d at 103.  In some circumstances, "it is possible that a breach of contract also gives rise to an actionable tort[.]  To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral." eToll, 811 A.2d at 14 (quoting Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. Ct. 1992)).

As discussed above, the gist of the action doctrine acts to foreclose tort claims:  (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contact claim or the success of which is wholly dependent on the terms of a contract. eToll, 811 A.2d at 19 (citations omitted).[4]

### 1.   Negligence

Trice's negligence claim is barred by the gist of the action doctrine.  The plaintiff alleges in the negligence count of its complaint that "[p]ursuant to the professional engineer/designer and client relationship that existed between Trice and Lighthouse, Lighthouse owed Trice a duty of care." Compl. ¶ 24.  Lighthouse deviated from this alleged duty because it "failed to provide the skill, prudence, and diligence that would be used by professional engineers/designers of ordinary

---

[4] The Court acknowledges that it is to exercise caution in making a determination regarding the gist of the action at the motion to dismiss stage.  See Weber Display & Packaging v. Providence Wash. Ins. Co., No. 02-7792, 2003 WL 329141, at *4 (E.D. Pa. Feb. 10, 2003).  In this case, however, due to Trice's limited allegations in support of each claim, the Court is able to determine whether the gist of Trice's claims is in contract or tort without further evidence from discovery.

skill and capacity." Id. ¶ 25.  Ultimately, "Lighthouse has caused Trice financial harm in the form of project expenditures, delays in production and loss of opportunity to market the device." Id. ¶ 27.

Under Pennsylvania law, courts apply the gist of the action doctrine "where the duties allegedly breached were created and grounded in the contract itself."  To determine whether the gist of the claim sounds in contract or in tort, the court must determine the source of the duties allegedly breached.  If the duties flow from an agreement between the parties, the claim is deemed to be contractual.  Conversely, if the duties breached were of a type imposed on society as a matter of social policy, the claim is deemed to sound in tort. In other words, if the duties in question are intertwined with contractual obligations, the claim sounds in contract, but if the duties are collateral to the contract, the claim sounds in tort.  Bealer v. Mut. Fire, Marine & Inland Ins. Co., No. 04-5915, 2005 WL 1819971, at *4 (E.D. Pa. Aug. 1, 2005), aff'd, 242 F. App'x 802 (3d Cir. 2007).

Here, the plaintiff asserts that Lighthouse's duty arose from its relationship to Trice in a professional engineer/designer role.  That relationship was codified in the Development Contract, which encompassed the parties'

relationship with regard to the "Development and Prototyping of an Office Arthroscope."  Trice does not allege any duties arising out of its relationship with Lighthouse that are independent of the Development Contract.  Therefore, Trice's claim of negligence is barred by the gist of the action doctrine because the gravamen of the claim is in contract.  See Bealer, 2005 WL 1819971, at *3-4; Factory Mkt. v. Schuller Int'l, 987 F. Supp. 387, 394-95 (E.D. Pa. 1997); Phico Ins. Co. v. Presbyterian Med. Serv. Corp., 663 A.2d 753, 757-58 (Pa. Super. Ct. 1995).

### 2.   Fraud

Trice's fraud claim is barred by the gist of the action doctrine.  The plaintiff alleges in the fraud count of its complaint that "Lighthouse made false representations of material facts with respect to the design and development of a commercially feasible version of an 'Office Arthroscope,' . . . with knowledge of their falsity or in reckless disregard of whether they were true or false, for the purpose of inducing Trice to act in reliance upon them."  Compl. ¶ 43.  As a result of Lighthouse's misrepresentations, "Trice was defrauded and/or induced to accept and execute the Development Contract."  Id. ¶ 45.  "Lighthouse's misrepresentations have caused Trice to

suffer[] substantial monetary harm, have delayed Trice's ability to market its 'Office Arthroscope' device, and have caused Trice to lose a valuable opportunity in the marketplace." Id. ¶ 46.

The Pennsylvania Superior Court has discussed the application of the gist of the action doctrine to claims for fraud in the performance of a contract versus claims for fraud in the inducement. "[F]raud in the inducement of a contract would not necessarily be covered by [the gist of the action] doctrine because fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself." eToll, 811 A.2d at 20.

A breach of contract claim, however, "cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform." Galdieri v. Monsanto Co., 245 F. Supp. 2d 636, 650 (E.D. Pa. 2002). A court must examine whether the fraud claim is actually barred by the doctrine "based on the individual circumstances and allegations of the plaintiff." eToll, 811 A.2d at 17.

Fraud claims should be barred where they arose during the course of the parties' contractual relationship, where the allegedly fraudulent acts also were breaches of duties "created and grounded in the contract," and where the damages "would be

23

compensable in an ordinary contract action [and] thus, the claim would essentially duplicate a breach of contract action." Id. at 20-21.

A fraud claim was barred in Advanced Tubular Products, Inc. v. Solar Atmospheres, Inc., No. 03-0946, 2004 WL 540019 (E.D. Pa. Mar. 12, 2004), aff'd, 149 F. App'x 81 (3d Cir. 2005), where the plaintiff alleged that the defendant induced the plaintiff to enter into a contract by falsely representing that the defendant could perform the necessary services. The gravamen of the plaintiff's fraudulent inducement claim was that "ATP presented Solar with the specifications, which Solar felt it could provide, and the parties had a 'qualification process' to test whether Solar could properly heat-treat ATP's product." 2004 WL 540019, at *7. Therefore, the court had to determine whether the defendant properly heat-treated the coils, "which is merely a question of performance of the contract." Id. The court concluded that the plaintiff "may not rely upon Solar's representations that it felt it could 'handle' the specifications to convert this contract-based action into a claim of fraudulent inducement." Id.

A similar fraud counterclaim was barred by the gist of the action doctrine in KSM Associates, Inc. v. ACS State Healthcare, LLC, No. 05-4118, 2006 WL 847786 (E.D. Pa. Mar. 30,

2006), where the defendant asserted that the plaintiff breached its duty to properly perform system development services and create workable software.  The court found that this duty was embodied in the letter of intent agreement signed by the parties.  "[T]he agreement is far from collateral to the fraud claim; rather . . . the agreement is at the heart of [the] fraud claim, and therefore the gist of [the] fraud action is unmistakably contractual, not tortious."  Id. at *3 (quoting Caudill Seed & Warehouse Co., Inc. v. Prophet 21, Inc., 123 F. Supp. 2d 826, 834 (E.D. Pa. 2000)).

The defendant also failed to state a claim by alleging that the plaintiff fraudulently misrepresented that it had the skill, experience, or personnel to fulfill its contractual obligations.  "This type of misrepresentation, regarding KSM's subjective qualifications and competency to perform the software development services, is inextricably intertwined with KSM's failure to perform under the LOI."  Id. at *4.[5]

_____

[5] There is an important distinction between fraud related to a party's statements of its objective qualifications and its subjective qualifications.  Objective qualifications, such as certifications, implicate broader social policy matters, while subjective qualifications, such as a party's own belief as to its expertise and competence, simply relate to the failure to perform under the contract drafted between the parties.  Thus, fraud claims based on misrepresentations as to a party's subjective competency to perform services or provide goods

Although Trice alleges that it was induced to enter into the Development Contract as a result of Lighthouse's misrepresentations, Compl. ¶ 45, those alleged misrepresentations were "with respect to the design and development of a commercially feasible version of an 'Office Arthroscope." Id. ¶ 43.  These misrepresentations were solely related to the matters incorporated in the parties' Development Contract, and therefore that agreement is at the heart of the fraud claim.

To the extent that Trice is referring to Lighthouse's stated capabilities, those statements relate to Lighthouse's subjective qualifications and are encompassed by Lighthouse's alleged failure to perform under the agreement.  Similarly, to the extent that Trice is asserting that Lighthouse knew or should have known that it could not provide certain services regarding the development of the arthroscope prior to the execution of the Development Contract, the parties' obligations related to those services are encapsulated by the terms of the contract and solely raise a question of performance under the

_____

pursuant to an agreement are barred by the gist of the action doctrine.  See KSM Assocs., 2006 WL 847786, at *4 (citing Air Prods., 256 F. Supp. 2d at 342 & n.12); see also Caudill, 123 F. Supp. 2d at 833-34; Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc., 939 F. Supp. 365, 370 (E.D. Pa. 1996).

contract.  Therefore, Trice's claim of fraud is barred by the gist of the action doctrine because the gravamen of the claim is in contract.

### 3.  Negligent Misrepresentation

Trice's negligent misrepresentation claim is barred by the gist of the action doctrine.  The plaintiff alleges in the negligent misrepresentation count of its complaint that "Lighthouse provided false information to Trice with respect to the design and development [of] a commercially feasible version of an 'Office Arthroscope' without exercising reasonable care or competence . . . ."  Compl. ¶ 31.  "Trice hired Lighthouse based not only on its representations that it had 'unique capability in the design and manufacture of miniature medical optics devices,' as set forth in the Development [Contract], but, as importantly, based on its representation that it had the right to assign to Trice a license to 'sell any designs used in the deliverables described in' the Development Contract."  Id. ¶ 32. Trice also alleges that "Lighthouse knew or reasonably should have known that Clarus Medical would not release it[s] proprietary design of the subassembly embedded by Lighthouse, thereby frustrating Trice's ability to commercialize the product."  Id. ¶ 33.  As a result, "Trice has suffered financial

harm in the form of project expenditures, delays in production and loss of opportunity to market the device." Id. ¶ 34.

A plaintiff cannot assert a fraud or negligent misrepresentation claim when that theory is merely another way of stating its breach of contract claim, or when its success would be wholly dependent upon the terms of the contract. Montgomery Cnty. v. Microvote Corp., No. 97-6331, 2000 WL 134708, at *7 (E.D. Pa. Feb. 3, 2000), opinion corrected, 2000 WL 341566 (E.D. Pa. Mar. 31, 2000); see also Tier1 Innovation, LLC v. Expert Tech. Grp., LP, No. 06-4622, 2007 WL 1377664, at *4 (E.D. Pa. May 8, 2007) (dismissing allegations of fraud in the inducement and negligent misrepresentation on grounds that the claims pertained to representations regarding party's expertise and ability to perform its duties under the agreement); Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 402-03 (E.D. Pa. 2002).

The only misrepresentations alleged by Trice in support of its claim for negligent misrepresentation are that the defendant stated it would adhere to the terms of the Development Contract and then failed to follow those terms. In fact, Trice even cites the Development Contract for the source of Lighthouse's misrepresentations. See Compl. ¶ 31. Furthermore, the Development Contract is the source of

28

Lighthouse's intellectual property obligations, such as with regard to Clarus Medical's proprietary design, rather than some other social policy.  Id. ¶ 32.  Therefore, Trice's claim of negligent misrepresentation is barred by the gist of the action doctrine because the gravamen of the claim is in contract.

### 4. Breach of Fiduciary Duty

Trice's breach of fiduciary duty claim is barred by the gist of the action doctrine.  Trice's allegations with regard to Lighthouse's alleged breach of fiduciary duty are as follows:  "Trice placed actual trust and confidence in Lighthouse to design and develop a prototype for the optimal 'Office Arthroscope.'"  Compl. ¶ 48.  Trice then "reasonably relied upon Lighthouse's superior knowledge in optical engineering and design with respect to the design and development of a prototype for the optimal 'Office Arthroscope.'"  Id. ¶ 49.  Based on this "disparity in the bargaining positions of the parties," Lighthouse allegedly abused its position of trust with Trice.  Id.  As a result, "Trice has suffered financial harm in the form of project expenditures, delays in production and loss of opportunity to market the device."  Id. ¶ 50.

A fiduciary duty is the highest standard of any duty implied by law. Ginley v. E.B. Mahoney Builders, Inc., No. 04-1986, 2005 WL 27534, at *1 (E.D. Pa. Jan. 5, 2005). A fiduciary relationship arises under Pennsylvania law where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." Id. at *1 (quoting Becker v. Chi. Title Ins. Co., No. 13-2292, 2004 WL 228672, at *8 (E.D. Pa. Feb. 4, 2004)).

Claims for breach of fiduciary duty and breach of contract can coexist if the fiduciary duty is based on duties imposed as a matter of social policy and if the fiduciary duty is not based on a contractual agreement between the parties. Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008). A breach of fiduciary duty claim may survive the gist of the action doctrine where the fiduciary relationship in question is well-established and clearly defined by Pennsylvania law or policy, including those between attorneys and their clients, majority and minority shareholders, and joint venturers. Ginley, 2005 WL 27534, at *2.

A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded

in contractual obligations.  Batoff v. Charbonneau, No. 12-5397, 2013 WL 1124497, at *7 (E.D. Pa. Mar. 19, 2013) (citing Alpart, 574 F. Supp. 2d at 499).  The fiduciary duty claim is then "inextricably intertwined" with the breach of contract action.  See id. (fiduciary duty claim barred where fiduciary duties created by provisions in an option agreement); Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 621 (E.D. Pa. 2010) ("Plaintiffs put forth no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist outside . . . obligations under the Employment Agreements."); see also Clark Motor Co. v. Mfrs. & Traders Trust, Co., No. 07-856, 2008 WL 9393759, at *10 (M.D. Pa. Nov. 20, 2008), aff'd, 360 F. App'x 340 (3d Cir. 2010).

     The relationship at issue in this action, between a design and engineering firm and its client, is not among those relationships typically identified by Pennsylvania policy as fiduciary in nature.  The obligations owed by such a firm to its clients are generally defined by the terms of their contract rather than by grander social policies embodied in the law of torts.  See, e.g., Ginley, 2005 WL 27534, at *2.

     Trice has alleged that it placed "actual trust and confidence" in Lighthouse "to design and develop a prototype for the optimal 'Office Arthroscope.'"  Compl. ¶ 48.  That

31

relationship, however, stems from the Development Contract and not from some independent social duty.  This is an arm's length commercial relationship, rather than one of special trust or confidentiality.  See Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc., 28 F. Supp. 2d 947, 953 (E.D. Pa. 1998) ("There is a crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or a party in a position to exercise undue influence and entering an arms length commercial agreement, however important its performance may be to the success of one's business.").

In this case, a fiduciary relationship does not arise as a matter of social policy.  If such a relationship exists, it arises solely because of the contractual arrangement between the parties.  Therefore, Trice's claim of breach of fiduciary duty is barred by the gist of the action doctrine because the gravamen of the claim is in contract.


C.   Leave to Amend

Trice has requested the opportunity to amend its complaint.  Pl.'s Opp'n at 34-35.  The Third Circuit has held that if a complaint is vulnerable to dismissal under Rule 12(b)(6), the district court must permit a curative amendment, unless an amendment would be inequitable or futile.  Alston v.

32

Parker, 363 F.3d 229, 235-36 (3d Cir. 2004) (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)). Dismissal without leave to amend is justified on the grounds of bad faith, undue delay, prejudice, or futility.  Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997)).

        The Court declines to allow Trice leave to amend its complaint at this time because Lighthouse has not moved to dismiss Trice's breach of contract claim, and therefore that claim will proceed.  Furthermore, the parties have fully briefed and argued the gist of the action issue, and the Court concludes that, based on that briefing, allowing Trice to amend its complaint at this time to establish whether its tort claims are collateral to the breach of contract claim is futile.

        Although the Court does not allow Trice to amend its complaint at this stage, if Trice concludes, as a result of ongoing discovery into the breach of contract claim, that additional facts exist that support the dismissed claims, Trice may file an amended complaint prior to the close of discovery.

IV.   <u>Conclusion</u>

For the reasons stated above, the Court will grant the defendant's motion to dismiss.  Counts I, II, IV, and V of the plaintiff's complaint are dismissed.  The plaintiff's claim for breach of contract (Count III), not at issue in this motion to dismiss, shall proceed.

An appropriate Order shall issue.